IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| SARAH DICKEY,<br><br>                Plaintiff,<br><br>vs.<br><br>MAHASKA HEALTH PARTNERSHIP; KEVIN DERONDE; TIMOTHY BREON; and DAVID LANGKAMP,<br><br>                Defendants. | 4:23-cv-00193-SHL-SBJ<br><br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

**I.     INTRODUCTION.**

Defendant Mahaska Health Partnership ("MHP") terminated Plaintiff Sarah Dickey the day she returned from FMLA leave in the aftermath of an investigation into, among other things, whether Defendant Kevin DeRonde engaged in discriminatory conduct when he terminated or decided not to renew the contracts of all four female physicians in the MHP emergency department. Dickey brings claims against Defendants for sex discrimination, hostile work environment, and retaliation claims under state and federal law. Defendants move for summary judgment (ECF 61), asserting—as to the sex discrimination and retaliation claims—that they terminated Dickey for a non-discriminatory reason and that her involvement in the investigation into DeRonde's conduct is not protected activity under state or federal law anyway. They further assert that Dickey has not established a prima facie case for hostile work environment or sex discrimination.

The Court agrees that Dickey has not offered sufficient facts to withstand summary judgment on her hostile work environment and sex discrimination claims and therefore GRANTS the Motion for Summary Judgment as to those claims under both state and federal law. Conversely, the Court concludes that Dickey has offered sufficient facts, viewed in the light most favorable to her, to establish a prima facie case for retaliation and to rebut Defendants' proffered non-discriminatory reason for termination. The Court therefore DENIES the Motion for Summary Judgment as to the state and federal retaliation claims.

## II.     BACKGROUND.[1]

Dickey was employed with MHP from March 19, 2018, through January 3, 2022. (ECF 74-1, ¶ 1.) MHP is a county hospital in Oskaloosa, Iowa. (Id., ¶ 2.) MHP is governed by an elected Board of Trustees (the "Board"). (Id., ¶ 3.) The Board had seven members at most times relevant to this dispute: Defendant David Langkamp (President), Amy McGriff, Jim Hansen, John Pothoven, Marsha Riordan, Amber Coffey, and Margaret Ratcliff. (Id., ¶ 4.) Greg Gordy replaced Pothoven in fall 2021. (Id.) Defendant Timothy Breon, M.D., was employed by MHP at all relevant times as its Chief Medical Officer. (Id., ¶ 5.) Defendant Kevin DeRonde was employed by MHP at virtually all relevant times as its Chief Executive Officer ("CEO"). (Id., ¶ 6.)

DeRonde hired Dickey on March 19, 2018, for the role of Director of Human Resources Culture & People at MHP. (Id., ¶ 9.) A woman, Jacky Bresnahan, served in that role previously. (Id., ¶ 10.) Dickey was paid $95,000 per year and was part of MHP's Executive Team. (Id., ¶¶ 11–12.) In June 2020, Dickey was promoted to the new position of Chief Human Resources Officer ("Chief HRO") with a significant compensation increase to $146,000 per year. (Id., ¶¶ 13–16.) As Chief HRO, Dickey reported directly to DeRonde and played an active role in company strategy and policymaking. (Id., ¶ 17.) Despite being in an executive-level position, Dickey had concerns that Human Resources ("HR") was not given the same priority as other MHP departments. (Id., ¶ 21.) During Dickey's tenure at MHP, every employee in HR was female. (Id., ¶¶ 24–25.)

In fall 2021, the Board investigated various issues relating to DeRonde's performance as CEO, which involved what some Board members viewed as poor judgment. (Id., ¶ 26.) This included concerns about: compliance with Stark laws relating to physician compensation; the recruitment of new physicians; stipends for employees; the display of Christmas trees in the hospital; the cost of coffee for employees; the employment of teenagers for scanning services; the capture of revenue under a drug program; the employment of DeRonde's wife in a marketing position; and the decision to terminate (or not renew) the contracts of four female physicians in the emergency department. (Id., ¶¶ 27, 29.) Most of the concerns raised with the Board came directly from Dickey. (Id., ¶ 28.)

The parties sharply dispute the circumstances surrounding the decision not to renew the contracts of the female emergency room physicians. It is unclear when MHP went through the

---

[1] On a motion for summary judgment, the Court resolves all disputed facts and draws all reasonable inferences in favor of the plaintiff as the non-moving party. *See Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 760 (8th Cir. 1998).

process of making that decision, but it culminated in an announcement from DeRonde on October 1, 2021, that one of the female emergency room physicians would be retiring in early 2022 and the contracts of the other three would not be renewed. (ECF 86, ¶ 17.) According to Defendants, MHP made the decision not to renew their contracts because of issues raised by Breon regarding the "culture" in the emergency department, which he feared would cause MHP to lose its Emergency Room Medical Director (Dr. David Cornelder) and Medical Director of Hospitalists (Dr. Matt Olson). (ECF 74-1, ¶ 30; ECF 81, p. 41.) MHP ended up recruiting and planning to hire four new emergency department physicians, one of whom was female. (ECF 74-1, ¶ 31.)

By contrast, according to Dickey, DeRonde made a comment to Chief Nursing Officer Andrea Hagist that MHP would only be hiring males in the future. (Id.) Furthermore, according to an email from then-Board Member Ratcliff dated October 11, 2021, two of the terminated female emergency room physicians "said several times that [DeRonde] has a problem with women physicians – there is a very definite Boys Club." (ECF 86, ¶ 1.) Female physician Dr. Lisa Ruckman similarly told Board members on October 11, 2021, that she felt "undertones" of "male chauvinism" from DeRonde and Breon. (Id., ¶ 2.) Dickey points out that the only emergency department physician who was *not* at risk of termination or non-renewal, Dr. Cornelder, was male. (See ECF 74-1, ¶ 29; ECF 74-2, ¶ 23.) Finally, Dickey contends that MHP only decided to hire a female replacement in the emergency room because Hagist told DeRonde to at least consider interviewing females. (See ECF 74-1, ¶ 31.)

Relatedly, the parties dispute what the Board was investigating in early October 2021 with respect to the four female emergency room physicians. According to Defendants, the Board was concerned about two things: inadequate documentation to support MHP's putative position that there were performance issues and the fact that the physicians were long-term employees and members of the community. (Id., ¶ 32.) Dickey contends there was a third issue being investigated: whether those physicians were being discriminated against based on sex. (See id., ¶¶ 32–33.) She cites, among other things, the comments identified in the preceding paragraph to Board Members in early October about "male chauvinism" and DeRonde "ha[ving] a problem with women physicians." (ECF 86, ¶¶ 1–2.)

Dickey also provides evidence of other allegedly improper comments or acts from DeRonde, Langkamp, and/or Breon over the years, including: (i) DeRonde saying, in reference to a local hairdresser, "[y]ou know how women are, they'll probably spread this [rumor] around town

3

if you hear it" (id., ¶ 4); (ii) DeRonde referring to a female nurse as "super high drama" in a July 2019 text message (id., ¶ 5); (iii) DeRonde reprimanding a woman for becoming angry or aggressive toward colleagues but not reprimanding men in similar circumstances (id., ¶ 6); (iv) Langkamp and Breon favoring the opinions of men over women (id., ¶¶ 7–8); (v) Breon referring to Dr. Amanda Moreno (an emergency room physician) as a "drama queen" (id., ¶ 9; ECF 74-2, ¶ 17); (vi) Breon "confronting" Dickey during a meeting and refusing to let her leave to use the restroom but not treating then-Chief Financial Officer ("CFO") Gene Williamson (male) the same way (ECF 86, ¶ 10); (vii) DeRonde being "very dismissive of Sarah Dickey's opinion or input until a male colleague would substantiate her" and talking down to her (or about her) in ways he did not do with men (id., ¶ 11); and (viii) DeRonde asking Dickey to be "submissive," "vulnerable," and "subservient to him" (id.). Defendants dispute these asserted facts as overly vague or taken out of context. (Id., ¶¶ 4–11.)

The Board ultimately decided in early October 2021 to ask DeRonde to resign as CEO, which he did. (ECF 74-1, ¶ 34.) On October 15, 2021, however, the Board voted to rescind its prior action and reinstate DeRonde as CEO. (Id., ¶ 35.) Around the same time, Dickey requested leave under the Family and Medical Leave Act ("FMLA") based on "work-induced stress + anxiety and stress resulting in frequent panic attacks." (Id., ¶¶ 36–38.) She was initially granted intermittent FMLA leave, but this was changed to continuous on October 25, 2021. (Id., ¶ 39.) Dickey did not return to work until January 3, 2022, on which date her employment was terminated. (Id., ¶ 40.)

During Dickey's absence, Daris Rosencrance (male) replaced Williamson as CFO and the HR department continued to operate. (See id., ¶¶ 41–42.) Defendants assert that the HR team "appeared to function well" in Dickey's absence and that "[i]n early December 2021, then-current HR personnel, Crystal Harsin, Sheri Overbergen, and Ashly Sampson reported that HR was appropriately staffed and managing well." (Id., ¶¶ 42–43.) Dickey denies this, largely through a Declaration from Harsin, who assumed primary responsibilities for Dickey's job duties during Dickey's FMLA leave. (Id.; ECF 81, pp. 7–8.) Harsin states in her Declaration that "neither [DeRonde], nor anyone on the executive team, had a conversation with me, either individually or within a group of HR employees, about the staffing of the HR department or how the workflow was managing while [Dickey] was on FMLA." (ECF 81, p. 7, ¶ 5.) Harsin further states that she "had no indication that the Chief Human Resources Officer position would be eliminated or that Sarah Dickey would be terminated until after it occurred on January 3, 2022." (Id., p. 7, ¶ 6.)

4

It is undisputed that MHP ended up eliminating the Chief HRO position and restructuring the HR department so that it reported through the CFO. (ECF 74-1, ¶¶ 44–46.) The parties dispute, however, who made this decision. (Id., ¶ 44.) Defendants assert that it was the entire MHP Executive Team, whereas Dickey asserts that Rosencrance (who, as CFO, was a member of the Executive Team) was not consulted before the decision was made despite being heavily affected by it. (See id.) In any event, following the change, the highest-ranking position in the HR department was the Human Resources Supervisor, who was not part of the Executive Team and did not have ultimate authority over HR. (Id., ¶¶ 47–48.) MHP hired a woman to fill that position at a salary of $90,000 per year. (Id., ¶¶ 49–50.) When she left, another woman was hired to replace her. (Id., ¶ 51.) That role is still filled by a woman today. (Id., ¶ 52.)

On December 28, 2022, MHP received a "hold letter" from Dickey's counsel instructing MHP to keep emails, text messages, and similar materials. (ECF 86, ¶ 12.) DeRonde received the letter but "did nothing" to preserve relevant materials. (Id., ¶¶ 13–14.) There is an approximate two-year gap (10/30/2019 to 10/17/21) of missing text messages from DeRonde's phone that he could not explain, nor could the messages be retrieved from cloud storage. (Id., ¶ 15.)

### III.    LEGAL STANDARDS.

#### A.  Summary Judgment Standard.

Summary judgment is appropriate where, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Smith v. Ashland, Inc.*, 250 F.3d 1167, 1171 (8th Cir. 2001). "A fact is material if it 'might affect the outcome of the suit.'" *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

#### B.  Employment Discrimination Standards.

Dickey brings claims for sex discrimination, hostile work environment, and retaliation under the Iowa Civil Rights Act (Iowa Code Chapter 216), Title VII of the Civil Rights Act of 1964, and the Equal Protection Clause of the United States Constitution pursuant to 42 U.S.C. §

1983. (ECF 30.)[2] Those claims are generally evaluated under the same framework. *See Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 (8th Cir. 2014); *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1014 (8th Cir. 2013); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004); *Garang v. Smithfield Farmland Corp.*, 439 F. Supp. 3d 1073, 1097 (N.D. Iowa 2020).

In a discrimination or retaliation claim, the plaintiff may survive summary judgment by providing direct evidence of discrimination or retaliation based on protected status. *See Mayorga v. Marsden Bldg. Maint. LLC*, 55 F.4th 1155, 1161 (8th Cir. 2022). In the absence of direct evidence, "the plaintiff may establish an inference of discrimination or retaliation under the burden-shifting framework provided by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Anderson v. KAR Glob.*, 78 F.4th 1031, 1036 (8th Cir. 2023). In a sex discrimination claim, a plaintiff must first establish a prima facie case by showing that: "(1) she was a member of the protected group; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination." *Bell v. Baptist Health*, 60 F.4th 1198, 1203 (8th Cir. 2023). Similarly, to establish a prima facie case for retaliation, a plaintiff must show: "(1) she engaged in protected conduct; (2) a reasonable employee would have found her employer's retaliatory action materially adverse; and (3) the materially adverse action was causally linked to her protected conduct." *Parker v. United States Dep't of Agric.*, 129 F.4th 1104, 1114 (8th Cir. 2025). Finally, to establish a prima facie case for hostile work environment, the plaintiff must show that "(1) she is a member of a protected group; (2) unwelcome harassment occurred; (3) a causal nexus existed between the harassment and her protected group status; and (4) the harassment affected a term, condition, or privilege of employment." *Hairston v. Wormuth*, 6 F.4th 834, 841 (8th Cir. 2021). "The fourth element requires [the plaintiff] to demonstrate that the harassment she experienced was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Id.*

"If the plaintiff succeeds [in establishing a prima facie case], the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action." *Gibson v. Concrete Equip. Co.*, 960

---

[2] Dickey also brought claims for unequal pay and disability discrimination but does not resist dismissal of those claims. (ECF 74, ¶¶ 3–4.) The Court therefore GRANTS Defendants' Motion for Summary Judgment as to those claims.

F.3d 1057, 1062 (8th Cir. 2020). "If the defendant rebuts the presumption, the burden shifts back to the plaintiff to demonstrate that the proffered non-discriminatory reason is pretextual." *Id.*

## IV. LEGAL ANALYSIS.

### A. Defendants Are Entitled to Summary Judgment on Dickey's Hostile Work Environment Claim.

Dickey's hostile work environment claim fails at the prima facie stage because she has not established sufficient facts—even viewed in the light most favorable to her—to allow a reasonable juror to conclude she experienced harassment based on sex that was severe or pervasive enough to create an abusive working environment. *See Hairston*, 6 F.4th at 841–42. Instead, she has merely produced evidence of animosity between the individual Defendants and herself and isolated instances of improper comments or conduct.

"Eighth Circuit precedent sets a high bar for conduct to be sufficiently severe or pervasive in order to trigger a Title VII violation." *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 538 (8th Cir. 2020). For example, isolated graphic sexual propositions and incidental unwelcome physical conduct are not enough. *See LeGrand v. Area Res. For Cmty. and Human Servs.*, 394 F.3d 1098, 1102–1103 (8th Cir 2005). Nor are isolated statements from a supervisor to the effect that he "never should have hired a female" or accusing a female employee of hating men. *See Paskert*, 950 F.3d at 538.

Here, Dickey's evidence includes isolated statements or conduct over her nearly-four-year tenure that: (a) were directed at someone else, such as DeRonde's comment about a local hairdresser spreading gossip or Breon's reference to a female emergency room physician as a "drama queen"; (b) occurred years before Dickey's termination, such as DeRonde's text message in July 2019 referring to a female nurse as "super high drama;" and/or (c) Dickey subjectively interprets as reflecting sexism, such as DeRonde being "very dismissive" of Dickey's opinion, Langkamp and Breon "appearing" to favor the opinions of men over women, Breon "confronting" Dickey during a meeting and refusing to let her leave to use the restroom, and DeRonde asking Dickey to be "submissive," "vulnerable," and "subservient to him." Even when these facts are interpreted in the light most favorable to Dickey, they do not meet the Eighth Circuit's "high bar" for establishing a prima facie case for hostile work environment. *See Hairston*, 6 F.4th at 842 (affirming summary judgment for defendant where the alleged incidents did not "permeate[]" or "poison[]" the work environment); *Paskert*, 950 F.3d at 538–39 (similar); *Griffith v. City of Des Moines*, 387 F.3d 733, 739 (8th Cir. 2004) (affirming summary judgment for defendant where

evidence merely showed "scattered derogatory comments"). Nor do they satisfy the requirements for establishing a hostile work environment claim under the Iowa Civil Rights Act. *See Farmland Foods v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 744–45 (Iowa 2003) (affirming dismissal of race-based hostile work environment claim where evidence showed "sporadic" incidents that were "often separated by long gaps in time" and did not involve overt references to the employee's race). The Court therefore GRANTS Defendants' Motion for Summary Judgment on Dickey's hostile work environment claims.

      *B.  Defendants Are Entitled to Summary Judgment on Dickey's Sex Discrimination Claim.*

Dickey's sex discrimination claim also fails at the prima facie stage because she has not established sufficient facts—even viewed in the light most favorable to her—to allow a reasonable juror to conclude that the "circumstances permit an inference of discrimination" in connection with her termination. *Bell*, 60 F.4th at 1203.[3] The undisputed facts show that Dickey's predecessor was female, her successor was female, her successor's successor was female, her colleagues in her department were all female, and the same supervisor (DeRonde) who fired her also was the person who hired her in the first place and later promoted her and increased her pay. The mere fact that, within a relatively short period of time, Dickey was hired and promoted by the same person who fired her creates "a strong inference that discrimination was not a motivating factor" in her termination. *Arraleh v. Cty. of Ramsey*, 461 F.3d 967, 976 (8th Cir. 2006). The rest of the undisputed facts reinforce that conclusion and compel the Court to conclude Dickey's sex discrimination claim fails as a matter of law. *See, e.g.*, *Aulick v. Skybridge Ams., Inc.*, 860 F.3d 613, 622 (8th Cir. 2017) (affirming summary judgment for defendant on age discrimination claim where undisputed facts showed, among other things, that employer hired three other individuals of similar age in recent years); *Page v. Ark. Dep't of Corr.*, 49 F. App'x 663, 664 (8th Cir. 2002) (per curiam) (affirming summary judgment for defendant in race and sex discrimination claim where, among other things, undisputed facts showed plaintiff was replaced by a person of the same race and sex).

Dickey tries to chip away at the significance of the undisputed facts by arguing, among other things, that some of her job responsibilities were assumed by a male, Daris Rosencrance.

---

[3] Defendants do not dispute that Dickey has satisfied the first three elements of a prima facie case of employment discrimination claim under Title VII, the Iowa Civil Rights Act, and the Equal Protection Clause: (1) she was a member of the protected group; (2) she was qualified to perform her job; and (3) she suffered an adverse employment action. (See ECF 61-1, pp. 4–5.)

(ECF 78, p. 10.) Although relevant, this is insufficient in context to overcome the significance of the undisputed fact that the same supervisor who fired her—DeRonde—is also the person who hired her, promoted her, substantially increased her pay, and placed her on the Executive Team in the first place. *See, e.g.*, *Arraleh*, 461 F.3d at 976–77 (affirming summary judgment for defendant where the same supervisor hired and terminated the plaintiff); *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 175 (8th Cir. 1992) ("It is simply incredible, in light of the weakness of plaintiff's evidence otherwise, that company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later.").

Dickey also cites Eighth Circuit precedent recognizing that an employer's decision to replace one female employee with another female "is not necessarily a determinative factor" in whether the terminated employee has a viable discrimination claim. (ECF 78, pp. 9–10 (quoting *Walker v. St. Anthony's Med. Ctr.*, 881 F.2d 554, 558 (8th Cir. 1989)).) This precedent makes clear, however, that the gender of the replacement is nonetheless relevant to that inquiry and should be considered in light of all surrounding circumstances. *See Walker*, 881 F.2d at 558. Here, the surrounding circumstances show that it was not merely Dickey's successor who was female, but also her predecessor, her successor's successor, and every one of her colleagues. Moreover, Dickey held her position for nearly four years before being terminated, during which time she was promoted, given a substantial pay increase, and placed on the Executive Team. These facts go well beyond what *Walker v. St. Anthony's Medical Center*, 881 F.2d 554 (8th Cir. 1989), held to be insufficient and are enough to satisfy the Court that no reasonable juror could infer discriminatory intent.

Dickey next relies on the same isolated comments and conduct at issue in her hostile work environment claim. (ECF 78, pp. 8–9.) Much of that evidence involves comments directed at others, however, or her subjective interpretation of interactions with executives or board members over a multi-year period. *See Mayorga*, 55 F.4th at 1162 (affirming summary judgment for defendant despite plaintiff's claim that her supervisor "could not tolerate being challenged by a woman" where the evidence did not indicate discrimination). Again, it is not enough to allow a reasonable juror to conclude she was terminated based on sex.

The strongest piece of evidence cited by Dickey is DeRonde's statement, as allegedly recounted by Chief Nursing Officer Andrea Hagist, that MHP would not be hiring women. (ECF 74-1, ¶ 31; ECF 81, p. 60.) Despite containing two layers of potential hearsay, this statement likely

would be admissible at trial because both layers (DeRonde's original statement to Hagist, and Hagist's recounting of that statement to Dickey) appear to be statements by party opponent for purposes of Fed. R. Evid. 801(d)(2). *See, e.g.*, *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 552 (8th Cir. 1998) (holding that district court properly admitted statements purportedly made by manager about employment decisions even when the statements came in through multiple declarants); *Gonnerman v. McHan Const., Inc.*, 520 F. Supp. 2d 1095, 1108 (N.D. Iowa 2007) (similar). The problem for Dickey, however, is that DeRonde's statement was made in the context of the emergency department physicians, not Dickey's own position. (ECF 81, p. 60.) It was therefore unrelated to the decisional process for her termination. *See Arraleh*, 461 F.3d at 975 ("We have carefully distinguished between comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions, from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process."). For this reason—and because the executive team continued to include several women even after Dickey's termination—the statement allegedly made by DeRonde is not enough to allow Dickey's claim to survive summary judgment. *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) (affirming summary judgment for defendant in discrimination case where improper statements allegedly made by decisionmaker were unrelated to the decisional process that led to plaintiff's termination).

Finally, Dickey argues that she has presented evidence of pretext; namely, that Defendants falsely claim she was terminated based on the performance of the HR department while she was on FMLA leave. (ECF 78, p. 11.) As explained in the next section, the Court agrees that Dickey has presented evidence of pretext in the sense that a reasonable juror could conclude she was terminated based on her involvement in the investigation of DeRonde, not based on how the HR department functioned in her absence. But the Eighth Circuit has made clear that "the showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee." *Nelson v. Lake Elmo Bank*, 75 F.4th 932, 938 (8th Cir. 2023). Dickey "must show that the circumstances permit a reasonable inference to be drawn that the real reason [the employer] terminated her was because of her sex." *Id.* Here, the discrepancies in Defendants' explanation for terminating Dickey's employment are insufficient to allow an inference of discrimination based on sex given that Dickey worked for MHP for nearly four years, was promoted and served on the Executive Team, and that her predecessor, successor,

successor's successor, and colleagues were all female. The Court therefore GRANTS Defendants' Motion for Summary Judgment on Dickey's sex discrimination claim.

### C. Defendants Are Not Entitled to Summary Judgment on Dickey's Retaliation Claim.

Dickey's retaliation claim starts on stronger footing than her sex discrimination claim because the undisputed facts show a close temporal connection between Dickey's involvement in the Board's investigation into DeRonde's conduct as CEO and her termination. *See Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119–20 (8th Cir. 2006) (recognizing that timing may support an inference of a causal connection between protected activity and termination), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). Specifically, the investigation concluded in early October 2021 when DeRonde briefly resigned after Dickey provided unfavorable information about him to the Board. Several days later, just as DeRonde was about to be reinstated, Dickey went on FMLA leave. Dickey and DeRonde apparently did not cross paths again until January 3, 2022, when she returned from FMLA leave and he immediately had her terminated. Meaning: DeRonde fired Dickey on the first day they were in the office together following the Board's investigation. This timing goes a long way toward allowing a reasonable juror to draw the inference that she was terminated in retaliation for her involvement in the investigation. *See King v. Preferred Tech. Grp.*, 166 F.3d 887, 893 (7th Cir. 1999) (holding that plaintiff established prima facie case for retaliation under Title VII where evidence showed she was terminated one day after completing leave of absence).

Granted, timing alone is not enough to establish a prima facie case. *See Wallace*, 442 F.3d at 1119. But Dickey has presented plenty more, including evidence that in mid-October 2021, Defendants Breon, Langkamp, and DeRonde exchanged text messages characterizing Dickey as "evil" in the midst of the Board's investigation into DeRonde's conduct (ECF 81, p. 50 (message from Langkamp to Breon)), trying to keep Dickey from accessing DeRonde's computers during his brief resignation (id., p. 53 (message from DeRonde to Breon)), and suggesting, around the time of DeRonde's reinstatement, that they "think[] about how we terminate Sarah [Dickey] this mission is not over!" (id. (message from Breon to DeRonde)). These messages strongly reinforce the inference of causation between Dickey's involvement in the investigation and her termination. *See Wallace*, 442 F.3d at 1120 (concluding the plaintiff established a prima facie case for retaliation based on the combination of timing and comments that reflected animus, among other factors). Indeed, these facts are similar to those in *Peterson v. Scott County*, 406 F.3d 515, 524–25 (8th Cir.

11

2005), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011), where the Eighth Circuit concluded the plaintiff established a prima facie case of retaliation when the evidence showed the supervisor made a calendar entry about the plaintiff's "dismissal" on the same day the plaintiff complained about discrimination.

Despite these connections between the Board's investigation and Dickey's termination, Defendants move for summary judgment on the theory that Dickey is not entitled to protection under Title VII or the Iowa Civil Rights Act because she was merely a "participant" in an internal employer investigation. (See ECF 61-1, pp. 18–20.) Defendants point out that "[e]very Court of Appeals to have considered this issue squarely has held that participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause [of 42 U.S.C. § 2000e-3]." (Id., p. 18 (quoting *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 49 (2d Cir. 2012)).) Likewise, Defendants assert that the Iowa Civil Rights Act's participation clause "does not extend to an employee's participation in an internal employer investigation not related to an administrative action initiated by the Iowa Civil Rights Commission." (Id., p. 19.) It follows, according to Defendants, that Dickey cannot establish a prima facie case of retaliation under Title VII or the Iowa Civil Rights Act. (Id., pp. 19–20.)

In response, Dickey argues, correctly, that Title VII and the Iowa Civil Rights Act do not merely prohibit retaliation against a "participant" in a formal investigation, but also against an employee who "opposes" an unlawful employment practice, which "may occur even though the employee has not filed a 'formal complaint.'" *Gustafson v. Genesco, Inc.*, 320 F. Supp. 3d 1032, 1051 (S.D. Iowa 2018) (quoting *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 862 (Iowa 2001)); (ECF 78, pp. 17–18.) Specifically, 42 U.S.C. § 2000e-3(a) makes it unlawful to "discriminate against any individual . . . because he has **opposed** any practice made an unlawful employment practice by this subchapter." (emphasis added). Similarly, Iowa Code § 216.11(2) makes it unlawful "to discriminate or retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully **opposed** any practice forbidden under this chapter." (emphasis added). "A plaintiff need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying challenged conduct violated the law." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714 (8th Cir. 2000).

12

The question, then, is whether Dickey was a mere "participant" in the Board's internal investigation into DeRonde's performance as CEO, or if she "opposed" allegedly discriminatory behavior. In *Crawford v. Metropolitan Government of Nashville and Davidson County*, 555 U.S. 271 (2009), the United States Supreme Court provided helpful guidance on what it means to "oppose" discrimination for purposes of Title VII. "The term 'oppose,' being left undefined by the statute, carries its ordinary meaning . . . ." *Id.* at 276. "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *Id.* An employee need not show that she was "active" or "consistent" in expressing her opposition to the discriminatory action to have a viable Title VII claim; instead, as *Crawford* explains:

> "Oppose" goes beyond "active, consistent" behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it. Countless people were known to "oppose" slavery before Emancipation, or are said to "oppose" capital punishment today, without writing public letters, taking to the streets, or resisting the government. And we would call it "opposition" if an employee took a stand against an employer's discriminatory practices not by "instigating" action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons. Cf. *McDonnell, supra,* at 262 (finding employee covered by Title VII of the Civil Rights Act of 1964 where his employer retaliated against him for failing to prevent his subordinate from filing an EEOC charge). There is, then, no reason to doubt that a person can "oppose" by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.

*Id.* at 277–78.

With this definition of "oppose" in mind, Dickey has provided sufficient evidence to allow a reasonable juror to conclude she was terminated in retaliation for "opposing" discriminatory practices. The Board's investigation into DeRonde's conduct involved some topics that would fit within what Title VII and the Iowa Civil Rights Act prohibit, including, especially, concerns about potential sex discrimination in the employment decisions in the emergency room. Dickey claims that she specifically warned DeRonde not to terminate the female emergency room physicians (ECF 74-2, ¶ 19), and later told MHP's outside counsel that his decision to do so anyway was an example of him being "sexist" (id., ¶ 21). This is enough to constitute "opposition" to discrimination, particularly in light of the statements from three female physicians raising similar

concerns during the investigation, including comments that DeRonde "ha[d] a problem with women physicians," there was a "Boys Club" atmosphere at MHP, and there were "undertones" of "male chauvinism" from DeRonde and Breon. *See Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1032 (8th Cir. 2013) (concluding that employee "opposed" discriminatory conduct by telling supervisor to stop making offensive statements and reporting offensive conduct to the human resources director in response to questions in an internal investigation). Indeed, three of MHP's Board Members ended up resigning prior to DeRonde's reinstatement pursuant to a letter that that reminded MHP of its obligation to treat all employees fairly and in accordance with MHP policy "no matter what their age, gender, race or religion." (ECF 74-2, ¶ 30.) According to one of those Board Members, James Hansen, this line was included in the letter because of concerns about DeRonde "terminating women in bulk from the hospital." (Id.) These facts are enough to allow a reasonable juror to find that (i) the Board's investigation indeed covered potential discrimination in violation of Title VII and the Iowa Civil Rights Act; and (ii) Dickey's involvement in that investigation rose to the level of "opposition" to those allegedly discriminatory practices. *See id.* It follows that a reasonable juror could conclude DeRonde terminated Dickey in retaliation for engaging in protected conduct.

Granted, the Board's investigation into DeRonde also involved topics that are not relevant to anti-discrimination laws, such as his decision to hire his wife for a marketing position and other complaints about his management. A reasonable juror therefore could conclude that Dickey's termination, if retaliatory at all, was not in retaliation for activity protected by Title VII or the Iowa Civil Rights Act. The Court could only reach this conclusion at the summary judgment stage, however, if it drew inferences in favor of Defendants, which it cannot do. *See, e.g., Schottel v. Neb. State Coll. Sys.*, 42 F.4th 976, 981 (8th Cir. 2022) ("We give the nonmoving party the benefit of all reasonable inferences in the record.").

With Dickey having established a prima facie case for retaliation, the burden shifts to Defendants to show a non-discriminatory reason for terminating her. They have satisfied this burden by presenting evidence that Dickey was terminated because the Executive Team decided the Chief HRO position was unnecessary after the HR department functioned fine in Dickey's absence. To that end, DeRonde submits a Declaration stating, in relevant part:

> In early December 2021, I inquired with our other HR team members, Crystal Harsin, Sheri Overbergen, and Ashly Sampson, who reported that HR was appropriately staffed and managing well. . . . At that time, MHP's

14

> Executive Team made the decision to eliminate the Chief HRO position, and restructure HR to report through the new CFO, Rosencrance.

(ECF 61-3, p. 5, ¶¶ 35–36.) The burden then shifts back to Dickey to establish that Defendants' proffered reason is pretextual.

Dickey has satisfied this burden. First, as previously discussed, the evidence shows that Breon, Langkamp, and DeRonde exchanged text messages in mid-October 2021 (before Dickey even started FMLA leave) calling her "evil" and suggesting that MHP terminate her. These messages indicate the decision to terminate Dickey was effectively made in mid-October—before Dickey even started FMLA leave—and had nothing to do with how the HR department functioned in her absence. *See, e.g.*, *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1042–43 (8th Cir. 2010) (holding that plaintiff offered sufficient evidence to prove pretext where proffered reason for termination was inconsistent with other evidence); *Podkovich v. Glazer's Distribs. of Iowa, Inc.*, 446 F. Supp. 2d 982, 1018 (N.D. Iowa 2006) (similar).

Second, Harsin states, under oath, that "neither Kevin [DeRonde], nor anyone on the executive team, had a conversation with me, either individually or within a group of HR employees, about the staffing of the HR department or how the workflow was managing while Sarah was on FMLA." Harsin further states that she "had no indication that the Chief Human Resources Officer position would be eliminated or that Sarah Dickey would be terminated until after it occurred on January 3, 2022." This directly contradicts the part of DeRonde's Declaration claiming he consulted with Harsin and others in early December 2021 before the decision was made. This, again, undermines Defendants' assertion that the termination decision was based on the performance of the HR department in Dickey's absence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

Third, Rosencrance testified that he was not consulted in a meaningful way on the decision to get rid of the Chief HRO position even though he was part of the Executive Team, and the decision affected him personally by changing his job duties. This, again, casts doubt on the part of DeRonde's Declaration explaining who made the decision to terminate Dickey and why.

Fourth, and finally, the timing of the termination decision is significant. Dickey went on FMLA leave within one day of when the Board decided to reinstate DeRonde as CEO. DeRonde

had her fired the day her FMLA leave ended. When combined with the other evidence of pretext, this is enough to allow a reasonable juror to conclude Dickey was terminated in retaliation for opposing what she believed to be discrimination, not as part of a restructuring of the HR department. *See, e.g.*, *Lewis*, 591 F.3d at 1042; *Podkovich*, 446 F. Supp. 2d at 1018. The Court therefore DENIES Defendants' Motion for Summary Judgment on Dickey's retaliation claims under Title VII and the Iowa Civil Rights Act.

## V.     CONCLUSION.

The Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment. (ECF 61). Dickey's state and federal retaliation claims will proceed to trial. Her hostile work environment and sex discrimination claims are dismissed.

**IT IS SO ORDERED.**

Dated this 22nd day of April, 2025.

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE